UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

COLLETTE CAMPBELL,

                           Plaintiff,

        v.

NEW YORK CITY TRANSIT AUTHORITY,

                           Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
11-CV-2827 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Collette Campbell, currently proceeding *pro se*, brings the above-captioned action against the New York City Transit Authority, alleging claims of gender discrimination, age discrimination, disability discrimination, failure to accommodate, retaliation and creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and the American with Disabilities Act ("ADA"). Plaintiff also brings claims for "institutional discrimination" and "institutional retaliation," premised on gender, age, and disability. Defendant moves for summary judgment on all claims.[1] The Court heard oral argument on March 11, 2015. For the reasons discussed below, Defendant's motion for summary judgment is granted.

---

[1] Plaintiff's opposition to Defendant's motion for summary judgment also references a number of issues regarding the extent of Defendant's disclosures and other discovery disputes. (*See, e.g.*, Pl. Aff. ¶¶ 6–8.) By order dated November 6, 2013, Defendant was ordered to provide all outstanding discovery to Plaintiff on or before December 6, 2013. (Docket Entry No. 69.) Both parties were directed to contact the Court with any outstanding discovery disputes. (*Id.*) Given that Plaintiff had ample opportunity to raise her discovery disputes during the discovery period, and chose not to raise them with the Court as directed, the Court declines at this juncture to entertain her allegations that Defendant failed to provide her with all necessary discovery.

## I. Background

### a. The parties

The New York City Transit Authority ("Transit Authority" or "Defendant") is a public authority in New York City which operates public transportation systems, including the New York City subways and buses and the Staten Island Railway.

Plaintiff, born in 1956, was employed with the Transit Authority from October 1983 through August 2011. (Def. 56.1 ¶¶ 25, 28; Pl. 56.1 ¶¶ 25, 28; Pl. Aff. ¶ 2.) Plaintiff began working for Defendant as a railroad clerk, which involved working in a token booth and selling tokens for access to the New York City subway system. (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.) Plaintiff was eventually promoted to supervisor of stations as a Station Supervisor Level I, or "Level I Supervisor." (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.) Generally, a Level I Supervisor, amongst other things, supervises staff in customer service, operation of station controls, and the cleaning of stations. (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29.) Plaintiff was subsequently reassigned to a Station Supervisor Level II, or "Level II Supervisor," position. (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)

As a Level II Supervisor, Plaintiff's responsibilities included supervising Level I Supervisors and employees charged with cleaning subway stations, known as "cleaners." (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.) Level II Supervisors are also expected to conduct inspections of station and station equipment, supervise and assign station personnel, and "conduct[] investigations." (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29.) Part of Plaintiff's job was to ensure that cleaners properly performed their duties, and to ensure that station personnel followed the rules and regulations. (Def. 56.1 ¶¶ 31–33; Pl. 56.1 ¶¶ 31–33.) Plaintiff believed that she had the authority to initiate disciplinary procedures, or to take other appropriate action, against her subordinates if they violated rules and regulations or engaged in misconduct. (Def. 56.1 ¶¶ 35, 38; Pl. 56.1 ¶¶ 35,

38.)  Disciplinary procedures she employed included verbal instructions or reinstruction.  (Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36.)  Plaintiff would also investigate potential misconduct and obtain written statements from complainants or any witnesses to the misconduct on pre-printed Transit Authority statement forms, known as "Correspondence Sheets" or "G-2" forms.  (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40.)  Later in the disciplinary process, matters were occasionally referred to neutral arbitrators, who resolved disciplinary charges against cleaners.  (Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43.)

As a Level II Supervisor, Plaintiff was represented, for the purposes of collective bargaining and disciplinary proceedings, by Local 106 of the Transport Workers Union, which was also known as the Transit Supervisors' Organization ("TSO").  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30.)  Cleaners, Plaintiff's supervisees, were represented by Local 100 of the Transport Workers Union.  (Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.)  This is a different union than that which represented Plaintiff.  (Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.)  Each of the unions was subject to a different collective bargaining agreement, but both agreements contained disciplinary procedures.  (Aff. of Cynthia Davis ¶ 3 ("C. Davis Aff."), Docket Entry No. 79.)[2]

Jimmy Davenport, who is not a party to this action, was a cleaner employed by Defendant.  (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.)

---

[2]  Plaintiff objects to the affidavit submitted by Cynthia Davis on the ground that it "contorts" her deposition testimony of September 4, 2013.  (Pl. Aff. ¶ 4a.)  Plaintiff does not allege that the affidavit directly contradicts Cynthia Davis's deposition testimony, and thus the Court declines to disregard the affidavit as Plaintiff suggests.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) (noting that if the allegations in an affidavit submitted on a motion for summary judgment, explain or amplify prior deposition testimony, then the affidavit may properly be considered in evaluating the motion for summary judgment).

### b. March 2009 reporting location and Davenport comment

In March of 2009, Plaintiff was able to choose a new "preference" for her position, meaning she could select a new reporting location, a "tour" (or regular shift), and a regular work scheduling, consisting of five consecutive work days and two consecutive days off ("regular days off"). (Def. 56.1 ¶¶ 45–48; Pl. 56.1 ¶¶ 45–48.) Plaintiff selected the Utica Avenue Station on the A line ("Utica Station") as her reporting location, which was different from her previous location. (Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48.) Plaintiff's "tour" was 10:00 PM to 6:00 AM, and her regular days off were Friday and Saturday. (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.) At Utica Station, Plaintiff ensured that the cleaners she supervised reported for duty in uniform, and had their pass, badge and ID each day. (Def. 56.1 ¶ 50; Pl. 56.1 ¶ 50.) When cleaners arrived at the beginning of their shifts, which corresponded to the beginning of Plaintiff's shift, they reported to Plaintiff's office, where she would perform a "uniform inspection," checking that each cleaner was in uniform and possessed the proper credentials. (Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51.) She would also require each cleaner to sign in on a sheet. (Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51.) After the uniform inspection and sign-in, the cleaners would wait in the lunchroom while Plaintiff cross-referenced the sign-in sheet with her "coverage sheet," which listed the names of cleaners scheduled to work that evening, and recorded station assignments. (Def. 56.1 ¶¶ 52–54; Pl. 56.1 ¶¶ 52–54.) This process took approximately fifteen minutes. (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54.) After Plaintiff checked that all scheduled employees were present, Plaintiff would convene a meeting to advise the cleaners of their work assignments for the shift. (Def. 56.1 ¶¶ 52–56; Pl. 56.1 ¶¶ 52–56.) Plaintiff would also read a "safety tip of the day." (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56.) Plaintiff's predecessor at Utica Station typically held a similar meeting in the lunchroom, approximately twenty-five feet from Plaintiff's office, but Plaintiff found the lunchroom distracting because it

often had a television playing and sometimes employees would play chess during the shift turnover.  (Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57.)  Other departments at Utica Station shared the lunchroom during that time of the evening.  (Def. 56.1 ¶ 60; Pl. 56.1 ¶ 60.)

After Plaintiff began working at Utica Station in March 2009, several cleaners, including Davenport, complained about Plaintiff's regular uniform inspection.  (Def. 56.1 ¶¶ 63–64; Pl. 56.1 ¶¶ 63–64.)  To address the complaints, Superintendent Justin Hyppolyte held a meeting with Plaintiff and the cleaners to clarify the rules and regulations for everyone.[3]  (Def. 56.1 ¶¶ 65–66; Pl. 56.1 ¶¶ 65–66.)  At the meeting, Davenport stood up in front of everyone and asked why Plaintiff supervised "like that" and suggested her supervision style was why she had gray hair.  (Def. 56.1 ¶ 67; Pl. 56.1 ¶ 67.)  Plaintiff could not recall if Hyppolyte was present to hear the remark.  (Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68.)  Following the meeting, Hyppolyte did not instruct Plaintiff to change her procedures in any way.  (Def. 56.1 ¶ 70; Pl. 56.1 ¶ 70.)

### c.  August 6, 2009 incident

On August 6, 2009, Plaintiff was still employed as a Level II Supervisor at Utica Station.  (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.)  That day, Plaintiff's tour of duty was her regular 10:00 PM to 6:00 AM.  (Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.)  Around 10:00 PM, Plaintiff was in her office when Davenport reported for duty.  (Def. 56.1 ¶ 78; Pl. 56.1 ¶ 78.)  Plaintiff checked the "coverage sheet" and noted that Davenport was on "comp status," meaning he was not scheduled for work that evening and was not cleared to work.  (Def. 56.1 ¶ 79; Pl. 56.1 ¶¶ 72, 79.)  Plaintiff informed Davenport that he had clearance to resume work on August 7, 2009, not August 6, 2009.  He left her office before she could clarify with other Transit Authority officials whether he could work the shift

---

[3]  At oral argument, Plaintiff indicated this meeting may have been in June 2009.

beginning that evening, August 6, 2009.[4]  (Def. 56.1 ¶¶ 80–82; Pl. 56.1 ¶¶ 80–82.)  Plaintiff

initially assumed that Davenport had left Utica Station.  (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.)

Shortly thereafter, Plaintiff went to the lunchroom to look for another cleaner, and saw

Davenport in the lunchroom.  (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.)  Plaintiff instructed Davenport to

leave the premises, as he was not authorized to work.  (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88.)  As

Plaintiff recalls, Davenport responded with something like "who are you going to get to make me

leave?  I am not your child . . . ."  (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88; Tr. of Dep. of Collette Campbell

("Pl. Dep."), annexed as Def. Ex. S, 105:2–12.)  Davenport reported that Plaintiff ordered him

out of the lunchroom.  When he asked why she was being rude, she "told me to just leave right

now and I said I was[,] I she then replied 'I better.'"  (Def. 56.1 ¶ 89; Pl. 56.1 ¶ 89; G-2

Correspondence Sheet of Jimmy Davenport, Def. Ex. G.)  Approximately eight other cleaners

were in or near the lunchroom at the time of the incident.  (Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87; G-2

Correspondence Sheets, Def. Ex. H.)

Almost immediately after the incident in the lunchroom, Plaintiff returned to her office.

(Def. 56.1 ¶ 92; Pl. 56.1 ¶ 92.)  Davenport entered behind her, and Plaintiff and Davenport had a

verbal exchange.  (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.)  Davenport and Plaintiff filed divergent reports

regarding the incident.  (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.)  Plaintiff reports that Davenport told her

"you gray haired B[itch].  I'm going to F[uck] you up and get three people to say you

threaten[ed] me."  (Def. 56.1 ¶¶ 10, 97; Pl. 56.1 ¶¶ 10, 97.)  Plaintiff started screaming, and

Davenport ran away.  (Def. 56.1 ¶ 98; Pl. 56.1 ¶ 98.)  Davenport reported that Plaintiff screamed

"'get the fuck out of my office you asshole' with her finger pointing at [him.]"  (Def. 56.1 ¶ 100;

---

[4]  The shift was from 10:00 PM on August 6, 2009 through 6:00 AM on August 7, 2009.

Pl. 56.1 ¶ 100.)  No witnesses were present to observe the altercation in Plaintiff's office.  (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.)

Plaintiff called station command and also called her union representative, Michael Troina, from her office, and activated the "emergency booth communications system," which connects to Transit Authority rail control, from the station booth.  (Def. 56.1 ¶¶ 101–02; Pl. 56.1 ¶¶ 101–02.)  Plaintiff requested police assistance.  (Pl. 56.1 ¶ 106.)  Plaintiff remained in the booth area until her supervisor, Denise Gregg, arrived.  (Def. 56.1 ¶ 110; Pl. 56.1 ¶ 110.)  Plaintiff and Gregg went to Plaintiff's office to complete her G-2 form,[5] recording Plaintiff's version of the events.  (Def. 56.1 ¶ 111; Pl. 56.1 ¶ 111.)  Gregg left and soon returned with Davenport.  (Def. 56.1 ¶¶ 111–12; Pl. 56.1 ¶¶ 111–12.)  When Gregg returned, Plaintiff was on the telephone with Superintendent Hyppolyte.  (Def. 56.1 ¶ 113; Pl. 56.1 ¶ 113.)  Plaintiff alleges that Davenport requested to speak with his union, and that Gregg told Davenport that she was trying to help him.  (Pl. 56.1 ¶ 111–12.)  Plaintiff handed Gregg the telephone and went to another office to fax her G-2 form to Hyppolyte.  (Def. 56.1 ¶ 114; Pl. 56.1 ¶ 114.)  Plaintiff claims she also faxed a request for medical attention to Hyppolyte at this time, but admits that Hyppolyte maintained[6] that he did not receive the fax.  (Pl. 56.1 ¶ 116.)

At approximately 12:55 AM on August 7, 2009, Gregg informed Plaintiff that she was being "held out of service," meaning Plaintiff was not to finish her scheduled shift for the day.[7]

---

[5]  A "G-2 form" or "Correspondence Sheet" is a pre-printed Transit Authority statement form used by complainants or witnesses to report and document misconduct.  (Def. 56.1 ¶¶ 39−40; Pl. 56.1 ¶¶ 39−40.)

[6]  Hyppolyte has retired and was unavailable to provide testimony.

[7]  Neither party indicated whether Plaintiff was paid for the remainder of her shift.

(Def. 56.1 ¶¶ 116–18; Pl. 56.1 ¶¶ 13, 116–18.)  Plaintiff was instructed to report to Cynthia

Davis in the Office of Labor Relations later in the morning on August 7, 2009 to discuss the

incident.  (Def. 56.1 ¶ 118; Pl. 56.1 ¶ 118.)  Either before or after being held out of service,

Plaintiff requested medical attention.[8]  (Def. 56.1 ¶ 120; Pl. 56.1 ¶ 120.)  She filled out a second

G-2 form regarding the incident, dated August 7, 2009, sometime later that night.[9]  (Def. 56.1

¶¶ 111, 115; Pl. 56.1 ¶ 111, 115; G-2 Correspondence Sheets of CR Campbell, Def. Exs. E, F.)

Plaintiff was taken to the hospital,[10] where she was examined and released at approximately 4:30

AM.  (Def. 56.1 ¶¶ 13, 121; Pl. 56.1 ¶¶ 13, 121.)  Hyppolyte met Plaintiff at the hospital and

remained with her until she was released.  (Def. 56.1 ¶ 121; Pl. 56.1 ¶ 121.)  At the hospital,

Plaintiff reported that she had suffered an injury on duty, in the form of stress, "elevated [blood]

pressure/heart" problems and headache, as a result of the incident.  (Def. 56.1 ¶¶ 14, 122, 136;

Pl. 56.1 ¶¶ 14d, 122, 136.)  Plaintiff alleges that she made this report the evening of the incident.

(Pl. 56.1 ¶ 14d.)

   Later that morning, Plaintiff spoke with Troina, her union representative.  She informed

Cynthia Davis[11] that she would be unable to meet that morning due to her medical condition.

_____

   [8]  Plaintiff asserts that Gregg held her out of service only after Plaintiff reported the
incident with Davenport and requested medical attention.  (Pl. 56.1 ¶ 13c.)

   [9]  The second G-2 form may have been composed while Plaintiff was in the hospital that
evening.  (*See* Pl. 56.1 ¶ 116 (stating that "Mr. Hyppolite [sic] claims he did not receive the fact
[sic] and a second statement was written while [P]laintiff was at the hospital.").)

   [10]  Plaintiff contends that Gregg delayed taking her to the hospital.  (Pl. 56.1 ¶ 13a.)

   [11]  Cynthia Davis works for Defendant in the Office of Labor Relations.  Defendant also
employs Saundra Davis, a manager of workers' compensation.  (Dep. of Saundra K. Davis, Pl.
Ex. B ("S. Davis Dep.") 6:17–22, Docket No. 75-2.)  For clarity, when referring to either Ms.
Davis, the Court refers to her by her full name.

(Def. 56.1 ¶¶ 123–24; Pl. 56.1 ¶¶ 123–24.)  Cynthia Davis instructed Plaintiff that she needed a

doctor's note excusing her from the meeting, and indicated that Plaintiff would be disciplined if

she did not bring a doctor's note.  (Def. 56.1 ¶ 125; Pl. 56.1 ¶ 125.)  Plaintiff was out of work

"on compensation status," due to her medical condition, from August 7, 2009 through August 12,

2009.  (Pl. Dep. 193:11–194:4; C. Davis Aff. ¶¶ 11, 13.)  It is not immediately clear whether

Plaintiff would have been able to return to work or whether holding her out of service carried

over into the following shifts, but Plaintiff's testimony indicates that she was absent from work

on these days due to her medical issue, but was not "out of service" or on suspension.  (Pl. Dep.

193:11–194:4.)

Davenport and Plaintiff each filed reports regarding the incident; Plaintiff claimed that

Davenport had threatened her, and Davenport claimed that Plaintiff had cursed at him.  (Def.

56.1 ¶ 11; Pl. 56.1 ¶ 11.)  Plaintiff claims that Davenport's report was "fabricated."  (Pl. 56.1

¶ 12c.)  While Plaintiff had been held out of service almost immediately following the incident,

(Def. 56.1 ¶¶ 116–18; Pl. 56.1 ¶¶ 13, 116–18), Davenport was held out of service the first day he

returned to work, August 9, 2009,[12] and was suspended the following day.  (Pl. 56.1 ¶¶ 12, 130;

Def. 56.1 ¶ 130.)  Davenport and Plaintiff were both charged with disciplinary violations as a

result of the incident.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.)

### d.  August 12, 2009 meeting and disciplinary charges

On August 12, 2009, Plaintiff reported to Cynthia Davis in Labor Relations, and brought

---

[12]   During her deposition, Cynthia Davis was asked to review a document, reporting the
August 6, 2009 incident, which indicated that Davenport could not be held out of service on
August 6, 2009 because he was on "comp status."  (Tr. of Dep. of Cynthia Davis, Pl. Ex. D ("C.
Davis Dep.") 67:2–19; Pl. Ex. E at CLD74–CLD75.)  Plaintiff also indicated that Davenport was
held out of service on the first day of his return to eligibility for service, August 9, 2009.  (Pl.
56.1 ¶ 12d.)

with her the requested note from her doctor, dated August 7, 2009, which advised that she was medically able to return to work that day, August 12.[13] (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.) Troina, Plaintiff's union representative, accompanied Plaintiff to the meeting with Cynthia Davis. (Def. 56.1 ¶ 126; Pl. 56.1 ¶ 126.) Cynthia Davis served Plaintiff with disciplinary charges and conducted what is known as a "step one" hearing regarding the August 6, 2009 incident. (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14c.) The disciplinary charges recommended Plaintiff's dismissal. (Dep. of Cynthia Davis, Pl. Ex. D ("C. Davis Dep.") 51:25–52:6, Docket Entry No. 75-2; Employee DAN History for Collette Campbell, dated Jan. 8, 2010, Pl. Ex. E at CLD108, Docket Entry No. 75-2 (noting six disciplinary charges dated August 6, 2009, with recommended penalties of dismissal).) Cynthia Davis contends that dismissal was recommended based on "an allegation of threats, of being threatened and being treated not properly by a supervisor and being yelled at and made to feel threatened [which] was made against [Plaintiff] by this cleaner." (C. Davis Dep. 53:12–19.) Plaintiff was suspended until August 18, 2009.[14] (Pl. 56.1 ¶¶ 14c, 18a; Pl. Dep. 193:19–22; C. Davis Dep. 49:11–14, 60:3–6, 62:17–25; Daily Notice dated Aug. 19, 2009, Def. Ex. O.)

At the August 12, 2009 hearing, Cynthia Davis explained that because there were no witnesses to the incident in the office, there was a "credibility issue" between Plaintiff and

---

[13] Plaintiff disputes that the note contained an accurate representation of her condition, as the note was written on August 7, 2009, and Plaintiff had a follow-up appointment with her doctor and with a cardiologist on August 11, 2009, and the August 7, 2009 note was not updated in light of that appointment. (Pl. 56.1 ¶ 14b.)

[14] Plaintiff indicates that she was unable to work during this time, regardless, and asserts that her time out of work during the period of August 12, 2009 through August 18, 2009, may have later been classified as compensation time. (Pl. Dep. 193:19–194:4.) Plaintiff was awarded workers' compensation for the period August 7, 2009 through April 5, 2010. (Workers' Compensation Case History, Pl. Ex. E, at CLD58.)

Davenport. Cynthia Davis explained that Davenport's disciplinary charges would be presented to an arbitrator prior to Plaintiff's charges, and commented that if Davenport's charges were sustained after an arbitration hearing, she would "take care of" the charges against Plaintiff. (Def. 56.1 ¶ 129; Pl. 56.1 ¶ 129.) On August 18, 2009, what is known as a "step two" hearing in the grievance process was held before a hearing officer, which Plaintiff, Troina, and Cynthia Davis attended. (Def. 56.1 ¶ 132; Pl. 56.1 ¶ 132.) The penalty of dismissal was sustained. (Pl. 56.1 ¶ 133; Disciplinary Notification for Collete Campbell, Def. Ex. L at P094.) Implementation of the penalty was delayed, however, pending resolution of Plaintiff's grievance before a neutral arbitrator. (*In re Arbitration between Manhattan & Bronx Surface Transp. Op. Auth. and Local 106, Transit Supervisors Org.*, Def. Ex. P. at 7.) At the meeting, Plaintiff's suspension was lifted and she was permitted to return to work the following day. (Def. 56.1 ¶ 133; Pl. 56.1 ¶ 133; Daily Notice dated Aug. 19, 2009, Def. Ex. O.)

At the August 12, 2009 meeting, Plaintiff told Cynthia Davis that she had sustained an injury on duty on August 6, 2009.[15] (Pl. 56.1 ¶ 21(2).) Following the meeting, Cynthia Davis requested that Troina accompany Plaintiff to the medical clinic, but Plaintiff declined to have him accompany her. (Pl. 56.1 ¶ 14e.)

Although Plaintiff presented a note from her doctor on August 12, 2009 which indicated she was able to return to work, Plaintiff remained on leave, collecting workers' compensation benefits, until April 5, 2010. (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15a–c.) Plaintiff alleges that the period

---

[15] In Cynthia Davis's deposition, Plaintiff also asked Davis if she gave Plaintiff a disciplinary action notice "on August 12, 2009, four days after" Davis had knowledge that Plaintiff had filed a workers' compensation claim, reported a workplace violence incident, and reported "sexual and other discriminatory harassment." Davis acknowledged that she did, to all three questions. (C. Davis Dep. 45:19–46:9.)

from October 7, 2009, through December 29, 2009, was qualifying medical leave under the

Family and Medical Leave Act ("FMLA").  (Pl. 56.1 ¶ 18.)  During the course of Plaintiff's

leave, Davenport's disciplinary charges, resulting from the August 6, 2009 incident, were

adjudicated and Davenport was suspended for thirty work days, or six weeks, without pay.  (Def.

56.1 ¶¶ 16, 131; Pl. 56.1 ¶¶ 16, 131.)  This penalty was imposed pursuant to an agreement by

stipulation, in which Davenport admitted to a single disciplinary charge for insubordination.[16]

(Pl. 56.1 ¶ 16a.)

Plaintiff returned to work from medical leave on April 5, 2010, and on July 6, 2010, an

arbitration hearing was held to review her disciplinary charge relating to the August 6, 2009

incident.  (Def. 56.1 ¶ 145; Pl. 56.1 ¶ 145.)  Although Plaintiff contends that the hearing was

"unlawful discipline" and was "an improper tri-partite hearing consistent with the [Station]

Supervisor Level I's" collective bargaining agreement,[17] Plaintiff admits that the hearing was

---

[16]  At oral argument on March 11, 2015, Plaintiff informed the Court that Davenport's
initial disciplinary charges also recommended his dismissal.  Plaintiff explained that her
supervisors had requested she testify at Davenport's disciplinary hearing, to resolve the
"credibility issue" earlier referenced by Cynthia Davis.  Plaintiff, however, never testified
against Davenport.  Plaintiff explained that she was informed that Defendant did not want to
have the disciplinary action pending until Plaintiff returned to work from leave, and decided to
proceed with adjudicating his charges, which ended with the agreement by stipulation.

[17]  Plaintiff was a Level II Supervisor at the time.  (Pl. 56.1 ¶ 21(10).)  Plaintiff has
presented no evidence to the Court that this procedure was inappropriate or improper other than
her own allegations.  While the documents outlining disciplinary procedures for Level II
Supervisors mention arbitration and do not mention a tri-partite panel, and the procedures for the
Subway Supervisors Association do mention a panel, (*compare* Pl. Ex. G at MT18 *with* Pl. Ex. G
at MT 22), Troina, Plaintiff's union representative, indicated that discussions between three
arbitrators was normal practice, (Tr. of Dep. of Michael Troina, Pl. Ex. F, 76:15–78:7.)  The
Court does note that the arbitration decision was authored and signed only by Daniel F. Brent,
"Impartial Chairman," but it did contain the names of Aliaa Abdelrahman as an "authority–
appointed arbitrator" and Troina as a "union-appointed arbitrator."  (Def. Ex. P at 2.)  Neither
signed the opinion.  (*Id.*)

held.  (Pl. 56.1 ¶¶ 145, 21(10).)  Plaintiff's disciplinary charge was dismissed by the arbitrator.

(Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16c; Def. Ex. P.)

### e.   Workers' compensation claim

Plaintiff completed an injury on duty form on August 7, 2009.[18]  (Def. 56.1 ¶ 134; Pl.

56.1 ¶ 134.)  She alleged that she had suffered an injury which involved her feeling "upset,

stressed" and having "elevated [blood ]pressure/heart[ trouble]" as a result of the August 6, 2009

incident.  (Def. 56.1 ¶¶ 135–36; Pl. 56.1 ¶¶ 135–36.)  Defendant contested Plaintiff's workers'

compensation claim, arguing that there was no accident within the meaning of the workers'

compensation law.  (Def. 56.1 ¶ 138; Pl. 56.1 ¶ 138.)  Plaintiff alleges that her claim was "falsely

controverted."  (Pl. 56.1 ¶ 138.)  Plaintiff's workers' compensation claim was ultimately

sustained by the Workers' Compensation Board.  (Def. 56.1 ¶ 142; Pl. 56.1 ¶ 142.)  While

Defendant asserts that Plaintiff was granted full benefits from August 6, 2009 through April 5,

2010, along with contractual differential pay, (Def. 56.1 ¶ 144), Plaintiff appears to dispute this

fact, (Pl. 56.1 ¶ 143).

At a hearing held on February 8, 2010, before the Workers' Compensation Board, the

judge presiding over the hearing found that Plaintiff was entitled to workers' compensation

payments for the period of October 7, 2009 through November 30, 2009, for a diagnosis of post-

traumatic stress disorder.  (Tr. of Workers' Comp. Hrg. on Feb. 8, 2010, Pl. Ex. H, 47.)  The

judge reserved decision for the periods of August 7, 2009 through October 7, 2009, and

November 20, 2009, through February 8, 2010, pending Plaintiff's presentation of further

---

[18]  Plaintiff asserts that Defendant improperly "controverted" her workers' compensation claim and provided the Workers' Compensation Board "with distorted, falsified information." (Pl. 56.1 ¶ 134.)

medical evidence. (*Id.*) The judge indicated that the case would have a follow-up hearing that May. (*Id.* at 46.) Plaintiff indicated that there was a decision from the Board that April. (Pl. 56.1 ¶ 143.) Though Plaintiff disputes Defendant's statement that she was granted full benefits from August 7, 2009 through April 5, 2010, Plaintiff's main contention appears to be that she was unlawfully denied her contractual differential pay. (Pl. 56.1 ¶ 143.) Plaintiff's workers' compensation case history, maintained by the Transit Authority, indicates that Plaintiff was awarded benefits in varying amounts for the period between August 7, 2009 and April 5, 2010. (Workers' Compensation Case History, Pl. Ex. E, at CLD58.)

### f. January 2010 investigation into chronic absenteeism

During the winter of 2009, the Transit Authority's Sick Investigation Unit was directed to review the sick leave usage of various subway supervisors, including Level I and Level II Supervisors. (Aff. of Denise Washington Aff. ("Washington Aff.") ¶¶ 4–7, Docket Entry No. 80.) As a result of the investigation, many supervisors, including Plaintiff, were served with disciplinary charges for chronic absenteeism.[19] According to Defendant, Plaintiff's disciplinary charge established that she was sick without pay on six occasions from January 2009 through April 2009, for a total of 25 days, and was sick for 6 days in May 2009 — which absences totaled 31 sick days over a period of 19 weeks. (Def. 56.1 ¶ 149; Def. Ex. R, annexed to Def. Mot. for Summary Judgment, Docket Entry No. 80-19; Pl. Confidential Ex. at TA-2 – TA-6, Docket Entry No. 75-4.) Plaintiff contends that the time period included her FMLA leave at the end of 2009, improperly included Plaintiff's workers' compensation dates leave, and that there

---

[19] The evidence indicates that approximately fifty supervisors were served with charges for sick leave abuse. (C. Davis Aff. ¶ 15; Washington Aff. ¶ 7.)

were otherwise "no deficiencies in the [P]laintiff's absences."[20] (Pl. 56.1 ¶ 147e.) There was no policy in place regarding the definition of chronic absenteeism, nor was there a policy forbidding the number of absences with which Plaintiff was charged. (Pl. 56.1 ¶ 149; Pl. Ex. O, Docket Entry No. 75-3.) Plaintiff contested the charges at a "step one" meeting on January 14, 2011 and at a "step two" meeting on March 9, 2011. (Disciplinary Notification for Collette Campbell dated Jan. 11, 2010, Def. Ex. R.) Because the charge against Plaintiff for chronic absenteeism was still pending when she retired, the charge was withdrawn without resolution. (C. Davis Aff. ¶ 15.)

### g. Plaintiff's retirement

On March 8, 2010, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.) In the charge, Plaintiff asserted claims of sex, age and disability discrimination as well as a retaliation claim. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.)

Plaintiff submitted her retirement papers in May or June of 2011, and her retirement became effective on August 29, 2011. (Pl. Aff. ¶ 2; Pl. Dep. 14:10–15:13.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

---

[20] Exhibit R, submitted by Defendant in support of the motion for summary judgment, is a Disciplinary Notification for the chronic absenteeism charges served on Plaintiff. The document and attached printout from the Transit Authority's automated timekeeping system supports Defendant's proposition that Plaintiff was absent sick without pay on six occasions from January 2009 through April 2009, and was sick for six days in May 2009. The records do not indicate whether the sick days in May 2009 were with or without pay.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., LLC*, 558 F. App'x 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd*, 678 F.3d at 174 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

The Second Circuit has cautioned that "'[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)). Finally, the court "must construe the *pro se* plaintiff's claims liberally in deciding the motion for summary judgment." *Thompson v. Tom Vazquez Janitorial*, No. 05-CV-808, 2006 WL 3422664, at *2 (E.D.N.Y. Nov. 28, 2006) (citing *Sawyer v. Am. Fed'n of Gov't Employees, AFL-CIO*, 180 F.3d 31, 36 (2d Cir. 1999)); *see also Ferran v. Town of Nassau*, 471 F.3d 363, 369 (2d Cir. 2006) ("This Court will construe briefs submitted by pro se litigants liberally.").

### b. Hostile work environment

Plaintiff claims that the actions of Davenport and of Defendant, including and following the August 6, 2009 incident, created a hostile work environment "and affected the terms and condition[s] of [Plaintiff's] employment."  (Pl. Aff. ¶ 2.)  Plaintiff argues that Davenport subjected her to "sexual . . . harassment" through his comments on August 6, 2009.  (Pl. 56.1 ¶ 97;[21] Charge of Discrimination, dated Mar. 8, 2010, annexed to Def. Mot. as Ex. D ("EEOC Charge"), 1.)  She further argues that, following the incident, Defendant's "actions, reactions, and inactions towards [Plaintiff] created a hostile work environment culminating" in her early retirement.  (Pl. 56.1 ¶ 17.)  Plaintiff also contends that Defendant "knew, tolerated and ratified the ageist and sexually harassing hostile work environment in which Plaintiff was forced to work . . . . and refused to abate and to remediate the resultant hostile work environment," which was hostile to Plaintiff on the basis of her age and sex.  (Am. Compl. at ECF No. 9.)  Defendant argues that Plaintiff has not presented facts that would support a claim for a hostile work environment, noting that a single incident "rarely" constitutes harassment, (Def. Mem. 8), and that Plaintiff cannot establish that any of the actions taken by her supervisors were connected to her gender, age or purported disability, (Def. Mem. 14, 16).

To establish a hostile work environment claim under Title VII and the ADEA, a plaintiff must provide evidence "that the complained of conduct: (1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such

---

[21] Plaintiff did not submit a memorandum of law in opposition to the motion for summary judgment, but frequently includes argument in her statement submitted pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

an environment because of the plaintiff's [gender or age]." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 260–61 (E.D.N.Y. 2012) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)) (internal quotation marks omitted) *aff'd*, 713 F.3d 163 (2d Cir. 2013). To withstand summary judgment, a plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)) (internal quotation marks omitted); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 78–79 (2d Cir. 2008) (A single incident may support a hostile work environment claim, but that incident must be so severe as to "constitute an 'intolerable alteration' of the plaintiff's working conditions so as to substantially interfere with or impair his ability to do [her] job." (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000)) (internal citations omitted)); *Leon v. Dep't of Educ.*, 16 F. Supp. 3d 184, 203 (E.D.N.Y. 2014) ("To state a claim for a hostile work environment, the Plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment.'" (quoting *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 240 (2d Cir. 2007))). The Second Circuit distinguishes between "[complaints of] sexual assaults; [other] physical contact[, whether amorous or hostile, for which there is no consent express or implied]; uninvited sexual solicitations; intimidating words or acts; [and] obscene language or gestures" and "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," which are not protected under the law. *Redd*, 678 F.3d at 177 (alteration in original) (citations omitted). If the hostile conduct originates from a worker, the plaintiff must also establish that the hostile work environment can be imputed to the employer in order to establish that an employer is liable for a

hostile work environment.  *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 189 (E.D.N.Y. 2013) (citing *Vance v. Ball State Univ.*, 570 U.S. ---, ---, 133 S. Ct. 2434, 2443 (2013) and *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)).  Finally, "it is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex."  *Desardouin*, 708 F.3d at 105 (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)) (internal quotation marks omitted).

Plaintiff has failed to provide evidence that would establish a hostile work environment claim under either Tile VII or the ADA.  Aside from broad allegations that Defendant created a work environment that was hostile to Plaintiff on the basis of her age and sex, the only evidence of conduct Plaintiff presents relates to Davenport's conduct in March of 2009 and on August 6, 2009.  Furthermore, Plaintiff has presented no evidence, aside from the fact that Davenport commented on the color of her hair[22] and called her a "bitch," to demonstrate that the incident was related to her age or sex.[23]  *See Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247, 2013 WL 1232355, at \*18 (E.D.N.Y. Mar. 26, 2013) ("Plaintiff has not presented any evidence from which a jury could infer that his work environment was objectively hostile, let alone permeated with any age or disability discriminatory animus."); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 293 (S.D.N.Y. 2009) ("Plaintiff has introduced *no* evidence of any gender-related or age-related comments made or actions taken by any District administrator or co-worker," with

---

[22]  Plaintiff's own account of the March 2009 incident indicates that the reference to the color of her hair was not related to her age, but rather to the way she supervised the cleaners at the station.

[23]  At oral argument, Plaintiff was asked whether there were any other incidents, remarks, or anything else that she considered to have created or contributed to a hostile environment. Plaintiff provided no additional evidence.

the exception of a few comments as to the plaintiff's age on unspecified occasions, which "would not be sufficient to survive summary judgment." (citing *Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002))). The Court grants Defendant's motion for summary judgment as to Plaintiff's hostile work environment claims.

### c. Title VII, ADA, and ADEA discrimination claims

Plaintiff argues that Defendant used the August 6, 2009 incident and Plaintiff's resulting diagnosis of post-traumatic stress disorder and hypertension to "unlawfully retaliate and discriminate" against Plaintiff. (Pl. Aff. ¶ 2.) Plaintiff argues that Defendant applied a different decision-making and disciplinary process to her as a result of the incident, and alleges it was discriminatory not to subject her and Davenport to same process. (Pl. Aff. ¶ 9b; Pl. 56.1 ¶ 18.) Plaintiff also contends that her 2010 write-up for chronic absenteeism was a pretext, though she does not allege what the write-up was intended to conceal. (Pl. Aff. ¶ 5c.) Broadly, Plaintiff asserts claims of gender, disability, and age discrimination.

Claims of employment discrimination under Title VII, the ADA, and the ADEA are assessed using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mills v. S. Conn. State Univ.*, 519 F. App'x 73, 74–75 (2d Cir. 2013) (applying *McDonnell Douglas* framework to Title VII gender discrimination claim); *Gorzynski*, 596 F.3d at 106 (applying framework to ADEA age discrimination claim); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (applying framework to ADA disability discrimination claim). Under the framework, a plaintiff must first establish a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). A plaintiff's

burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008)

(quoting *Hicks,* 509 U.S. at 506). To establish a *prima facie* case of employment discrimination

under Title VII, a plaintiff must show that: (1) she belongs to a protected class; (2) she was

qualified for the position in question; (3) she suffered an adverse employment action; and (4) the

adverse employment action occurred under "circumstances giving rise to an inference of gender

discrimination." *Mills*, 519 F. App'x at 75; *see also Doe v. City of New York*, 473 F. App'x 24,

27 (2d Cir. 2012). To establish a *prima facie* case of discrimination under the ADA, a plaintiff

must show that "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is

regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was

qualified to perform the essential functions of the job, with or without reasonable

accommodation; and (4) plaintiff suffered an adverse employment action because of [her]

disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir.

2010) (citations omitted); *see also Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 48–49

(2d Cir. 2014) (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013))

(outlining requirements for *prima facie* case under the ADA); *Leon*, 16 F. Supp. 3d at 196 (citing

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)) (same). To meet her initial burden

and establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must

demonstrate "(1) that she was within the protected age group, (2) that she was qualified for the

position, (3) that she experienced adverse employment action, and (4) that such action occurred

under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107.

If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*,

609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field*

*Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd* 461 F. App'x 59 (2d Cir. 2012). It

"is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks,* 509 U.S. at 509). If

the defendant offers a legitimate, nondiscriminatory explanation for its action, summary

judgment must still be denied, however, if the plaintiff can show that the explanation was

pretext. To make a sufficient showing at this final stage, the plaintiff's burden varies based on

the type of claim she brings. For Title VII claims, "the evidence in plaintiff's favor, when

viewed in the light most favorable to the plaintiff, [must be] sufficient to sustain a reasonable

finding that his dismissal was motivated at least in part by . . . discrimination." *Adamczyk v. N.Y.*

*Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (quoting *Tomassi v. Insignia Fin. Grp.,*

*Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570

U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based

discrimination under Title VII need not show that the causal link between injury and wrong is so

close that the injury would not have occurred but for the act. So-called but-for causation is not

the test. It suffices instead to show that the motive to discriminate was one of the employer's

motives, even if the employer also had other, lawful motives that were causative in the

employer's decision."); *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203,

209–10 (E.D.N.Y. July 18, 2013) (explaining the burden shifting analysis for Title VII

discrimination claims). However, a "'plaintiff bringing a disparate-treatment claim pursuant to

the ADEA' satisfies this burden by presenting facts, which 'taken in [her] favor, suffice to show

that a triable issue exists as to whether [her] age was a 'but for' cause of [her] termination.'"

*Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (quoting *Gorzynski*, 596 F.3d at

106) (original alterations omitted). "The condition that a plaintiff's age must be the 'but for'

cause of the adverse employment action is not equivalent to a requirement that age was the employers *only* consideration, but rather that the adverse employment action *would not have occurred without it.*" *Id.* at 169 (quoting *Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011)) (internal quotation marks and alteration omitted). "[T]he question of whether the heightened, but-for standard of causation . . . applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit." *Sherman v. Cnty. of Suffolk*, --- F. Supp. 3d ---, ---, 2014 WL 7370033, at *13 (E.D.N.Y. Dec. 29, 2014) (quoting *Castro v. City of New York*, 24 F. Supp. 3d 250, 269 n.34 (E.D.N.Y. 2014)) (internal quotation marks and original alteration omitted).

### i. *Prima facie* **case of discrimination**

### 1. **Protected group and qualification**

Plaintiff raises claims of discrimination on the basis of her gender, disability, and age. It is not disputed that Plaintiff is a woman, and Defendant does not appear to dispute that Plaintiff was qualified for her position. Plaintiff brings her disability claim on the grounds that Defendant[24] perceived that Plaintiff was disabled[25] as a result of the verbal interaction with

---

[24] The Court assumes, without deciding, that Defendant is covered by the ADA.

[25] It is questionable whether Plaintiff can establish a *prima facie* case of disability discrimination, because she has failed to produce any evidence that would support a finding that she suffered from or was regarded as suffering from a disability within the meaning of the ADA. *See Cody v. Cnty. of Nassau*, 345 F. App'x 717, 719 (2d Cir. 2009) ("[Plaintiff] failed to present sufficient evidence that [Defendant] regarded her as having 'an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'" (quoting *Toyota Motor Mfg., Ky., Inc., v. Williams*, 534 U.S. 184, 198 (2002))). Plaintiff presented medical testimony from her workers' compensation hearing that she was hypertensive, (Pl. Exs. I, J) but has failed to establish how this prevents or restricts her major life activities. *See Missick v. City of New York*, 707 F. Supp. 2d 336, 353 n.9 (E.D.N.Y. 2010) (finding plaintiff's doctors note, which indicated, *inter alia*, that plaintiff suffered from hypertension and should not get too stressed out and only do limited work "fails to establish the

Davenport on August 6, 2009. (Pl. 56.1 ¶ 17 n.9.) Plaintiff's claim of age discrimination is based on the references, made by Davenport, in March and August of 2009 regarding Plaintiff's gray hair, and on Plaintiff's age at the time of the incident. Plaintiff's claim of gender discrimination is based on the fact that she is a woman, and on the gendered term, "bitch" used by Davenport on August 6, 2009.

## 2. Adverse action

Plaintiff argues that she was subject to several adverse actions as a result of discrimination based on her gender, disability and age. She points to six events in particular: (1) Gregg held Plaintiff out of service following the August 6, 2009 incident; (2) Defendant served her with disciplinary charges as a result of the incident; (3) Defendant pursued the charges against her — which the Court construes to include the August 12–18 suspension; (4) Defendant failed to investigate, and presumably discredit, Davenport's allegations against Plaintiff; (5) Defendant controverted Plaintiff's workers' compensation claim; (6) Defendant served Plaintiff with disciplinary charges for chronic absenteeism. Plaintiff argues that she "involuntarily quit/retired" as a result of all of Defendant's actions, and was thus constructively discharged.[26]

---

necessary impairment to a major life activity sufficient to state an ADA claim"). Plaintiff also raised, at oral argument, the fact that she was diagnosed with post-traumatic stress disorder as a result of the August 6, 2009 incident, but does not indicate when she received this diagnoses, when the Defendant received notice of it, and whether it impaired or restricted her daily life activities within the meaning of the statute. The Court ultimately will not reach a decision as to whether Plaintiff has established that she suffered from or was regarded as suffering from a disability at the time of the adverse actions she claims.

[26] Plaintiff highlights that, in response to her Request for Admission No. 108, "Admit the fact that the plaintiff was a Station Supervisor Level II from 1986 until her involuntary retirement, constructive discharge effective on August 29, 2011," (Request for Admission No. 108, Docket Entry No. 75-2, at ECF No. 91), Defendant responded "Admit," (Response to Request for Admission No. 108, Docket Entry No. 88-2, at ECF No. 18). However, given that Defendant has at other times denied that Plaintiff was constructively discharged and has

(Pl. Aff. ¶ 2.)  Other than being held out of service which, the Court will assume without deciding was an adverse action, as discussed below, Plaintiff cannot show that any of the other actions were adverse.

"An adverse employment action is a 'materially adverse change in the terms and conditions of employment,' which can include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities,' among other possibilities." *Adams*, 560 F. App'x at 49 (alteration in original) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)); *see also Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004); *Albuja v. Nat'l Broad. Co. v. Universal, Inc.*, 851 F. Supp. 2d 599, 606 (S.D.N.Y. 2012) (noting that to satisfy the "adverse employment action" requirement, a plaintiff must show that the action affected "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002))).  Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)).  "[D]isciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotion, wages, or termination." *Eldridge v. Rochester City Sch. Dist.*, 968 F. Supp. 2d 546, 557 (W.D.N.Y. 2013) (quoting *Regis v. Metro. Jewish Geriatric Ctr.*, No. 97-CV-0906, 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000)); *see also Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 407 (S.D.N.Y. Mar.

consistently denied any discriminatory motive, (e.g. Request for Admission Nos. 53, 85, 87, 95, 106, 107, Docket Entry No. 75-2), including a specific denial that Plaintiff's retirement was involuntary (Request for Admission No. 103, Docket Entry No. 75-2), the Court declines to deem this admission dispositive.

10, 2014) ("[T]he threat of disciplinary action, without more, does not constitute an adverse employment action." (citing *Honey v. Cnty. of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) and *Bowles v. N.Y.C. Transit Auth.*, Nos. 00-CV-4213, 03-CV-3073, 2006 WL 1418602, at *10 (S.D.N.Y. May 23, 2006), *aff'd*, 285 F. App'x 812 (2d Cir. 2008))).

### A. August 6, 2009 discipline

As a result of the August 6, 2009 altercation with Davenport, Plaintiff was held out of service in the early hours of August 7, 2009, was served with disciplinary charges on August 12, 2009, and was suspended from August 12, 2009 through August 18, 2009. It is not clear from the record whether the holding out of service or the suspension resulted in lost pay or another material loss of benefits. Construing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that her removal from work on August 7, 2009 and suspension constituted an adverse employment action.

Instituting disciplinary proceedings which result in a suspension without pay can constitute an adverse employment action. *See Weber v. City of New York*, 973 F. Supp. 2d 227, 251 (E.D.N.Y. 2013) (finding that unsatisfactory performance evaluations culminating in suspension were a "materially adverse change in the terms and conditions of employment . . . [that was] more disruptive than a mere inconvenience or an alteration of job responsibilities" (alterations in original) (quoting *Bowles v. N.Y.C. Transit Auth.*, 285 F. App'x 812, 814 (2d Cir. 2008) and collecting cases))); *Morales v. N.Y.S. Dep't of Labor*, 865 F. Supp. 2d 220, 244 (N.D.N.Y. 2012) ("There is no question that plaintiff's one-week suspension without pay qualifies as an adverse employment." (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–24 (2d Cir. 2001))). However, a suspension with pay, particularly when implemented during an investigation into misconduct, does not, without more, constitute an

adverse action.  *Brown*, 673 F.3d at 150–51 (adding that "'[p]aid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies'" and reiterating that "a suspension with pay may sometimes rise to the level of an adverse employment action" (quoting *Joseph*, 465 F.3d at 92 n.1)).

Because suspension without pay typically meets the "materially adverse" standard, Plaintiff has presented a question as to whether these actions could constitute adverse actions under Title VII, the ADA, and the ADEA.[27]  Given the information before the Court, Plaintiff has demonstrated an issue of fact as to whether holding her out of service and suspending her could constitute adverse actions.  For the purposes of deciding Defendant's motion, the Court will treat (1) holding Plaintiff out of service, and (2) suspending her on August 12, 2009 as "adverse actions."

## B.   Other actions

As for the disciplinary charges served on Plaintiff for chronic absenteeism, Plaintiff has not shown that the charges led to any change in the conditions of her employment.  Here, the evidence shows that the charges for chronic absenteeism were held pending through Plaintiff's

---

[27]  It is unclear what impact the suspension actually had on Plaintiff's employment, given that she has presented her own testimony and a doctor's note supporting her contention that she was unable to work on August 7, 2009 due to her medical condition, and has testified that she was unable to work on August 12, 2009 through August 18, 2009 — and in fact was awarded workers' compensation for that time — because of her injury on duty.  Thus, there is a question as to what ultimate impact the decision to suspend her had on her employment.  Furthermore, all disciplinary charges relating to the August 6, 2009 incident were ultimately reversed by a neutral arbitrator through the disciplinary grievance process.  *See Wallace v. Suffolk Cnty. Police Dep't*, 396 F. Supp. 2d 251, 261 (E.D.N.Y. 2005) (noting that, in the First Amendment retaliation context, an employee is not adversely affected by disciplinary charges unless the charges are resolved against him) (citing *Washington v. Cnty. of Rockland*, 211 F.Supp.2d 507, 514 (S.D.N.Y. 2002)).

retirement, were withdrawn upon her retirement, and never had any impact on Plaintiff's employment.  Thus, the service of the chronic absenteeism charges is not an adverse employment action.  *See Eldridge*, 968 F. Supp. 2d at 557 (noting that disciplinary memoranda are adverse "only if they affect ultimate employment decisions such as promotion, wages, or termination" (quoting *Regis*, 2000 WL 264336, at *8)); *Morales*, 865 F. Supp. 2d at 244 (noting that although Plaintiff characterized disciplinary counseling memoranda as punitive, her evidence did not show "that any caused a decrease in her salary, a change in her title, a loss in her benefits, or any other change in her employment status") (citations omitted); *cf. Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (finding "notice of discipline" and "counseling memo" insufficient to constitute adverse action when the plaintiff did "not describe its effect or ramifications, how or why the effect would be serious, [or] whether it went to any file"), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Furthermore, Plaintiff cannot show that the failure to investigate Davenport's claim against her affected any of her tangible job benefits, and thus cannot show that this was an adverse action.  *See Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 237 (2d Cir. 2012) (noting that failure to take action against coworker for altercation was not adverse action). Plaintiff also concedes that she was paid workers' compensation benefits in full, thus the decision to controvert her workers' compensation claim did not constitute adverse action as it did not result in a material loss of benefits.

### C.   Constructive discharge

Plaintiff contends that her retirement was not voluntary, and was a constructive discharge.  (Pl. 56.1 ¶ 151.)  A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action.  *Pa. State Police v.*

*Suders*, 542 U.S. 129, 148 (2004).  It occurs only "when an employer 'intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'"  *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) (alteration in original) (quoting *Terry*, 336 F.3d at 152); *Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 632 (2d Cir. 2012) (constructive discharge exists when an employer "intentionally created an intolerable work atmosphere that force[d the plaintiff] to quit involuntarily" (quoting *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 185 (2d Cir. 2011)), *cert. denied*, 133 S. Ct. 836 (2013); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 299 (S.D.N.Y. 2009) ("Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007)). "'[A] constructive discharge cannot be proven merely by evidence that an employee preferred not to continue working for that employer' or that 'the employee's working conditions were difficult or unpleasant.'" *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (quoting *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)); *Edwards*, 957 F. Supp. 2d at 213 ("The standard for constructive discharge is demanding, and it 'cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were difficult or unpleasant.'" (alterations in original) (quoting *Madray v. Long Island Univ.*, 789 F. Supp. 2d 403, 409–10 (E.D.N.Y. 2011))).

Constructive discharge requires evidence (1) that the employer acted deliberately or intentionally in bringing about the complained of work conditions, and (2) that the conditions were "intolerable." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004); *see also Rogers v. Roosevelt Union Free Sch. Dist.*, No. 09-CV-3862, 2012 WL 6163130, at *4 (E.D.N.Y. Dec. 7,

2012) (using the *Petrosino* two-part analysis), *aff'd*, 553 F. App'x 88 (2d Cir. 2014). In order to meet the first requirement, the plaintiff must, at a minimum, show that the employer acted deliberately in bringing about the intolerable work conditions. *Petrosino*, 385 F.3d at 229–30; *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000) ("[S]omething beyond mere negligence or ineffectiveness is required."). Next, in order to determine whether the work conditions were "so intolerable as to compel resignation," the conditions must be "assessed objectively by reference to a reasonable person in the employee's position." *Petrosino*, 385 F.3d at 230; *see also Miller*, 408 F. App'x at 410 ("'The inquiry is objective: Did [the] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?'" (alterations in original) (quoting *Pa. State Police*, 541 U.S. at 141)); *Serricchio*, 658 F.3d at 185 ("Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (citations omitted).

Plaintiff has not shown that her retirement was involuntary or that she was constructively discharged. Plaintiff argues that she became a "lame duck" supervisor following the August 6, 2009 incident because the altercation with Davenport, and her need to fight disciplinary charges following the incident, undermined her authority with her subordinates, making her workplace intolerable. At oral argument, Plaintiff indicated that she felt that, as a supervisor, she should not have been disciplined in the same way Davenport was, further suggesting that her authority was undermined. Plaintiff has not shown any evidence that her work environment was intolerable. At most, the evidence shows that her working conditions may have been unpleasant. Plaintiff, however, has not pointed to any incident involving her other subordinates or supervisees to implicate the fact that her authority was undermined. Plaintiff's belief that she was a "lame

duck" or that her authority was undermined is insufficient to show that her workplace was intolerable. While it may have been an unpleasant environment for Plaintiff because of her belief, "a constructive discharge cannot be proven merely by evidence that . . . the employee's working conditions were difficult or unpleasant." *Miller*, 409 F. App'x at 410 (alteration in original) (citation and internal quotation marks omitted). There is no evidence to support her contention that it was *so* unpleasant that a reasonable person in her position would have felt compelled to resign.

Moreover, Plaintiff has not presented any evidence that would support a finding that Defendant deliberately brought about the condition she complained of. *See Adams*, 560 F. App'x at 50 (finding no material question of fact as to whether the plaintiff was constructively discharged when he informed his supervisors about harassment from a coworker, noting the employer was, "'at most, ineffective or even incompetent [in] handling [] the matter,' which 'does not rise to the level of deliberate action required by our precedent'" (quoting *Whidbee*, 223 F.3d at 74)). Furthermore, the evidence suggests that Plaintiff was transferred to another reporting location following the incident in response to her complaints about her working conditions, (Pl. Dep.242:12–243:5), undermining any argument that Defendant deliberately brought about the working conditions of which Plaintiff complains. As to Plaintiff's claim that being held out of service undermined her authority, it is unclear what material effect, if any, holding her out of service had on Plaintiff's employment over the nearly two years she remained with the Transit Authority following the incident. Her claim for constructive discharge fails.

### 3. Inference of bias or discrimination

Plaintiff must further show that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Inference of discrimination

"is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination." *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (citations omitted). An inference of discrimination can be drawn from circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (citation omitted), or by "showing that an employer treated [an employee] less favorably than a similarly situated employee outside his protected group," *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) (quoting *Ruiz*, 609 F.3d at 493). "In determining whether a genuine issue of material fact exists for trial," a court is obliged to "'carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

Plaintiff has shown no connection between her removal from service or suspension and her gender, age, or disability. Plaintiffs various arguments about the way she was treated following the August 6, 2009 incident do not raise an inference of discrimination. Plaintiff

argues that she and Davenport, a younger man, were similarly situated[28] and were not treated similarly following the August 6, 2009 incident, when she was held out of service the day of the incident and Davenport was not held out of service until he returned to work.  (Pl. 56.1 ¶ 12, 21.) Plaintiff, at oral argument, contended that Gregg was biased toward Davenport because she knew him, and thus treated him differently.  However, the record shows that Plaintiff and Davenport were treated similarly.  Plaintiff and Davenport were both held out of service on their first day of active duty following the incident, and both were suspended pending investigation into the incident.  Furthermore, the ultimate outcome of the disciplinary charges relating to the August 6, 2009 incident does not support an inference of discrimination against Plaintiff: Plaintiff's charges were dismissed following arbitration, and Davenport's charges were sustained and accompanied by a six-week suspension.

Plaintiff has done no more than point to various ways in which she feels she was mistreated and argue that it must have been because of her sex, age, or disability.  This is not sufficient to sustain a claim of discrimination.  *See Howard v. City of New York*, --- F. App'x ---, ---, 2015 WL 895430, at *2 (2d Cir. Mar. 4, 2015) (analyzing Section 1981 race discrimination claim, noting that remarks by someone other than a decision-maker, tied to adverse action by nothing more than "mere speculation" do not support an inference that adverse action was motivated by bias); *id.* at *3 ("In sum, [the plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that 'it must have been related to his race. This is not sufficient.'" (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001))); *Dorfman v. Doar Commc'ns, Inc.*, 314 F. App'x 389, 390–91 (2d Cir. 2009) ("The incidents upon which

---

[28]  The Court declines to decide whether Davenport, Plaintiff's subordinate, was similarly-situated to Plaintiff in respects relevant to the analysis here.

Appellant bases his claim . . . lack any hint of age discrimination beyond that provided by mere speculation." (citing *Bickerstaff*, 196 F.3d at 452)). "In the absence of any circumstantial evidence of discriminatory animus other than the differential treatment, the inference that the difference in treatment is attributable in part to discrimination would be based on speculation rather than on evidence or a rational inference." *Setelius v. Nat'l Grid Elec. Servs. LLC*, No. 11-CV-5528, 2014 WL 4773975, at *18 (E.D.N.Y. Sept. 24, 2014).

Because Plaintiff has failed to meet her burden to establish a *prima facie* case of gender, age, or disability discrimination under Title VII, the ADEA, or the ADA, the Court grants Defendant's motion for summary judgment on these claims.

### ii.    Failure to accommodate under the ADA

Plaintiff alleges that Defendant failed to accommodate her disability, but provides no facts in support of this allegation, nor has she provided any argument in opposition to the motion for summary judgment as to her claim of failure to accommodate. Failure to accommodate is a type of disability discrimination that also follows the *McDonnell Douglas* burden-shifting scheme. In order to establish a prima facie case for failure to accommodate, a plaintiff must show that (1) she is a person with a disability under the meaning of the ADA, (2) her employer is a covered entity, (3) the plaintiff could perform the essential functions of her job with an accommodation, and (4) the defendant refused to make such an accommodation. *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 9697 (2d Cir. 2009); *see also Ugactz*, 2013 WL 1232355, at *7 (same); *Rogers*, 2012 WL 6163130, at *5 (same). Plaintiff has failed to show that she made any request for an accommodation that was denied. Defendant's motion for summary judgment as to Plaintiff's failure to accommodate claim is granted.

### d. Retaliation

Plaintiff argues that Defendant used the August 6, 2009 incident and Plaintiff's resulting diagnosis of post-traumatic stress disorder and hypertension "to unlawfully retaliate and discriminate" against Plaintiff. (Pl. Aff. ¶ 2.) Plaintiff claims that her complaints related to the August 6, 2009 incident were protected activity because she believed that she was reporting discrimination based on age and sex, in the form of Davenport's offensive conduct, and on disability, in the form of her request for medical attention on the evening of August 6, 2009 and her subsequent medical leave.

Claims of retaliation for engaging in conduct protected by Title VII, the ADEA, and the ADA are examined under the *McDonnell Douglas* burden-shifting test. *See Summa*, 708 F.3d at 125 ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))); *Bruder v. Jewish Bd. of Family & Children's Servs.*, No. 10-CV-5951, 2013 WL 789231, at *7 (E.D.N.Y. Mar. 4, 2013) ("Retaliation claims under the ADEA are also analyzed under the *McDonnell Douglas* burden-shifting test." (citing *Gorzynski,* 596 F.3d at 110)); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (noting that the same test applies for ADA). First, the plaintiff must establish a *prima facie* case of retaliation. In order to establish a *prima facie* case of retaliation, a plaintiff must establish that "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *Fincher v. Depository Trust & Clearing Corp.*, 604

F.3d 712, 720 (2d Cir. 2010); *see also Summa*, 708 F.3d at 125; *Schiano*, 445 F.3d at 608.  The

burden at the summary judgment stage for Plaintiff is "'minimal' and '*de minimis*,'" and "the

court's role in evaluating a summary judgment request is to determine only whether proffered

admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory

motive."  *Kwan*, 737 F.3d at 844 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173

(2d Cir. 2005)).

  If the plaintiff establishes a *prima facie* case under the test, "then a presumption of

retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the

action that the plaintiff alleges was retaliatory."  *Fincher*, 604 F.3d 712, 720 (2d Cir. 2010)

(citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 568

n.6 (2d Cir. 2011) (discussing the burden shifting analysis in retaliation context); *Jute*, 420 F.3d

at 173 (2d Cir. 2005) (same).  If the employer succeeds at the second stage, the presumption of

retaliation dissipates, and the plaintiff must show that, but for the activity protected by Title VII

or the ADEA, she would not have been terminated.  *See Nassar*, 570 U.S. at ---, 133 S. Ct. at

2534 (emphasis added) (holding that a plaintiff asserting a Title VII retaliation claim "must

establish that his or her protected activity was a but-for cause of the alleged adverse action by the

employer"); *see also Joseph v. Owens & Minor Distribution, Inc.*, 5 F. Supp. 3d 295, 316

(E.D.N.Y. 2014) (same), *aff'd*, --- F. App'x ---, 2015 WL 664566 (2d Cir. Feb. 17, 2015); *Russo

v. New York Presbyterian Hosp*., 972 F. Supp. 2d 429, 454 (E.D.N.Y. 2013) (same); *Ellis v.

Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 279 (E.D.N.Y. 2013) (same); *Moore*, 2013 WL

3968748, at *14 (same).  The Second Circuit has yet to determine whether the "but for"

causation standard or the "motivating factor" standard applies to this final stage in retaliation

claims brought pursuant to the ADA.  *See Sherman*, --- F. Supp. 3d ---, ---, 2014 WL 7370033, at

*18 (noting it is unclear whether plaintiff needed to show a "motivating factor" or "but-for" causation to establish ADA retaliation claim); *Vale v. Great Neck Water Pollution Control Dist.*, --- F. Supp. 3d ---, ---, 2015 WL 248603, at *12 (E.D.N.Y. Jan. 20, 2015) ("As with traditional ADA discrimination claims, the Second Circuit has not yet articulated what standard now applies for ADA retaliation claims in light of *Gross* and *Nassar*." (quoting *Sherman*, --- F. Supp. 3d at ---, 2014 WL 7370033, at*18)); *Hernandez v. City of New York*, No. 11-CV-6644, 2015 WL 321830, at *5 n.8 (S.D.N.Y. Jan. 23, 2015) (noting that "[n]either the Supreme Court nor the Second Circuit has extended *Nassar's* holding to retaliation claims brought under the ADA, though several district courts have presaged such an extension" (citing *Sherman*, --- F. Supp. 3d at ---, 2014 WL 7370033, at *13–14 and *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 (2d Cir. 2014))); *see also Trane v. Northrop Grumman Corp.*, No. 11-CV-4040, 2015 WL 1057864, at *6 (E.D.N.Y. Mar. 10, 2015) (noting that "[t]he Court analyzes ADA retaliation claims under the same standard as Title VII retaliation claims" and that mixed-motive analysis does not apply to Title VII retaliation claims in the wake of *Nassar*) (citations omitted). Because the Court concludes that Plaintiff cannot meet even the lesser, mixed-motive standard, the Court declines to reach the question of which standard should apply.

### i. *Prima facie* case

#### 1. Protected activity, of which employer was aware

Defendant contends that Plaintiff did not engage in protected activity because Plaintiff did not do anything more than write up her subordinate for a disciplinary violation, which she was required to do as a Level II Supervisor. (Def. Mem. 16–17.) Plaintiff has, however, produced evidence that she believed she was reporting discrimination as protected by the statute. Plaintiff has presented evidence that she complained to Hyppolyte regarding Davenport's March

2009 comments, that she complained to Gregg and Hyppolyte regarding what she perceived to be Davenport's harassment on August 6, 2009, and has presented her own testimony that she complained of ageist and sexist working conditions. "It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) (alteration in original) (quoting *Treglia*, 313 F.3d at 719); *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999) (noting that the key question is whether the individual acted on a good faith and reasonable belief that her employer's actions violated the law). Plaintiff also alleges that she reported her disability when she requested medical attention following the August 6, 2009 incident, when she indicated to Davis that she had been injured on duty and could not attend the August 7, 2009 meeting, and seems to imply that she believed taking medical leave and filing a workers' compensation claim were also protected — and that controverting her claim was retaliatory for engaging in that activity.

Assuming, without deciding, that Plaintiff's complaints constituted protected activity for the purposes of her retaliation claims, Plaintiff's claims nevertheless fail, because, as discussed below, assuming Plaintiff can show that she suffered a materially adverse action, Plaintiff cannot show any causal connection between the alleged protected activity and the alleged adverse action.

### 2.    Materially adverse action

Adverse employment action is broader in the retaliation context than the discrimination context, and, therefore, in some instances, a plaintiff can establish an adverse action in a

retaliation claim, even if she cannot establish a discrimination claim. *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). In order to support a claim for retaliation, the adverse action "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see also Witkowich v. U.S. Marshals Serv.*, 424 F. App'x 20, 22 (2d Cir. 2011) (noting that to constitute an adverse action under the ADEA, the act must "'have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.'" (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006))); *Lovejoy–Wilson*, 263 F.3d at 223 ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases."); *Bruder*, 2013 WL 789231, at *7–8 (applying same standard to retaliation claim based on age discrimination).

Plaintiff claims that she suffered various incidents of retaliation following the August 6, 2009 incident, and that "Defendant[] used the events of August 6, 2009 to . . . unlawfully retaliate against her resulting in her being constructively discharged from her employment." (Pl. 56.1 ¶ 5.) To support this contention, Plaintiff points to (1) Gregg's decision to hold her out of service, (Pl. 56.1¶ 8a); (2) the disciplinary charges following the August 6, 2009 incident, including her suspension and the recommendation she be terminated; (3) the improper use of an arbitration panel, rather than a single arbitrator, to adjudicate her grievance of the August 6, 2009 disciplinary charge; and (4) what she contends was her "constructive discharge." Plaintiff argues these actions led her to become a "lame duck" supervisor following the incident, meaning she believes her authority was undermined, which created an intolerable environment for her. (*Id.*) She further contends that the service of disciplinary charges on August 12, 2009, and the later service of disciplinary charges for chronic absenteeism and sick leave abuse were retaliatory.

(Pl. 56.1 ¶ 17.)  Plaintiff also appears to argue that Defendant's initial denial of workers'

compensation benefits, decision to controvert her workers' compensation claim, and decision to

withhold differential payments during her period of leave, were all retaliatory.[29]  (Pl. 56.1

¶¶ 15a–c, 138.)

Assuming without deciding that each of the actions Plaintiff raises was adverse, the Court

nonetheless concludes that Plaintiff has failed to show that any of the alleged adverse actions

were taken in retaliation for Plaintiff's complaints relating to her gender, age, or disability.[30]

---

[29]  Plaintiff also raised, in her deposition, that she requested a reassignment from Utica Station after the incident and was reassigned to various locations, including 14th Street, West 4th Street, South Ferry, Grand Central, and others.  Plaintiff believed that transferring her was retaliatory.  (Pl. Dep. 242:12–243:5.)  A lateral transfer can constitute an adverse employment action.  *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 216 (E.D.N.Y. 2014) (examining whether transfer or failure to transfer may suffice to establish adverse action to support *prima facie* case of employment discrimination).  However, the evidence before the Court indicates that Plaintiff was transferred at her own request.  Plaintiff explained at oral argument that she asked not to work with Davenport, and Defendant chose to transfer her to a location other than Utica Station.  Plaintiff was upset that she was transferred and Davenport was not, but she said she just "let it happen."

[30]  While the disciplinary charges relating to the August 6, 2009 incident were ultimately reversed by an arbitrator, and the chronic absenteeism charge withdrawn without penalty, the institution of disciplinary proceedings may in some cases be sufficient to constitute adverse action which would have a deterrent effect on persons wishing to challenge discrimination in the workplace.  *See Weber v. City of New York*, 973 F. Supp. 2d 227, 268 (E.D.N.Y. 2013) (finding institution of disciplinary proceeding sufficient to satisfy adverse employment action prong of *prima facie* case in retaliation claim) (citing *Kelly v. Huntington Union Free Sch. Dist.*, 2012 WL 1077677, at *16 n.21 (E.D.N.Y. Mar. 30, 2012)).  *But see Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (finding that plaintiff had not made out a *prima facie* case of retaliation, noting that "the application of the employer's disciplinary policies to the employee, without more, does not constitute adverse employment action" (quoting *Joseph v. Leavitt,* 465 F.3d 87, 91 (2d Cir. 2006)) (internal quotation marks and alterations omitted))  Although district courts in this Circuit have disagreed as to whether an investigation into disciplinary charges that does not result in any discipline may be sufficient constitute an adverse action in the retaliation context, *see Weber*, 97 F. Supp. 2d at 269–70, the Court need not decide here whether the commencement of an investigation alone would suffice to establish an adverse employment action.  In this case, it appears as though Plaintiff was also suspended for several days following service of the disciplinary charges, which likely would constitute adverse action that would dissuade a

### 3. Causal Connection

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Dawson v. City of New York*, No. 09-CV-5348, 2013 WL 4504620, at *16 (S.D.N.Y. Aug. 19. 2013) (same). "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 111 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)); *see also Feingold*, 366 F.3d at 156 ("[T]he requirement that [Plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two."); *Treglia*, 313 F.3d at 720 ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation."). There is no brightline rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months. *See, e.g.*, *Gorzynski*, 596 F.3d at 110–11 (The Second Circuit held that it has not established "the outer limits beyond which a temporal relationship is too attenuated to establish causation[;]" however, "five months is not too long to find the causal relationship[.]"); *Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 457

---

reasonable worker from making a charge of discrimination. *See Satterfield v. United Parcel Serv., Inc.*, No. 00-CV-7190, 2003 WL 22251314, at *12 (S.D.N.Y. Sept. 30, 2003).

(E.D.N.Y. 2011) ("With regard to the establishment of a prima facie case through temporal proximity, the Second Circuit has not drawn a bright line as to how closely an adverse employment action must follow protected activity to imply that retaliation has taken place." (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)); *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) ("There is no bright-line beyond which a temporal relationship is too attenuated to prove causation." (citations omitted)).

Plaintiff has not shown any circumstances from which a reasonable jury could conclude that there was a causal connection between any of the alleged adverse actions and her alleged protected activities, that is, her complaints of discrimination. *Treglia*, 313 F.3d at 720 ("In order to establish the last element of a prima facie case of retaliation, [the plaintiff] must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent.") As a preliminary matter, there is a temporal disconnect between Plaintiff's retirement in the summer of 2011 and her complaint against Davenport, made on August 6, 2009. Furthermore, there is no evidence in the record that Plaintiff was disciplined because of her complaints about the August 6, 2009 incident. Despite the fact that the disciplinary charges, both for the August 6, 2009 incident and for chronic absenteeism, were instigated close in time to Plaintiff's complaint, there is no other evidence to indicate that her complaints of ageism and sexism (based entirely on Davenport's use of the words "gray-haired" and "bitch"), or her request for medical attention, were in any way a motivating factor for the disciplinary charge or charge relating to her chronic absenteeism.

### ii. Legitimate, non-discriminatory reason

Even assuming Plaintiff could show that there was a causal connection between any adverse action and her complaints, Defendant has proffered legitimate, non-discriminatory

reasons for the various actions, including an attempt to resolve the credibility issue between Davenport and Plaintiff regarding their altercation through uniform and impartial application of the disciplinary procedures, (*see* Cynthia Davis Aff. ¶¶ 9–10, 14), evidence of Plaintiff's actual excessive absenteeism, (Disciplinary Notification for Collette Campbell dated Jan. 11, 2010, Def. Ex. R), and a belief that Plaintiff was not entitled to workers' compensation as a result of her alleged injury arising from the altercation (Dep. of Saundra K. Davis ("S. Davis Dep.") 44:20–45:13, 67:20–68:15, 73:4–21, annexed as Pl. Ex. B, Docket Entry No. 75-2.).

### iii. Pretext

Plaintiff has not provided any facts beyond her speculation and vague, conclusory allegations that retaliatory motive played any role in Defendant's actions against her, nonetheless motive sufficient to show retaliatory intent within the meaning of the ADA, Title VII, or the ADEA. To survive summary judgment as to her ADA retaliation claim, Plaintiff would at least have to show that that retaliatory intent was a "motivating factor" in any action taken against her, if not the but-for cause of that action. *Sherman*, --- F. Supp. 3d at ---, 2014 WL 7370033, at *18 (noting it is unclear whether plaintiff needed to show a "motivating factor" or "but-for" causation to establish ADA retaliation claim). To survive summary judgment on a claim of retaliation under Title VII or the ADEA, Plaintiff would have to show that retaliatory intent was the "but-for" cause of any wrongful actions — that is, "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at ---, 133 S. Ct at 2533; *Kwan*, 737 F.3d at 850 (noting that Title VII retaliation claims must show "but-for" causation) (citing *Nassar*, 570 U.S. at ---, 133 S. Ct at 2533). Plaintiff is unable to meet either standard, and her claims of retaliation fail.

### e. Institutional discrimination and retaliation

Plaintiff includes a claim for "institutional discrimination" and "institutional retaliation" against defendant. (Am. Compl. 3.) In her charge of discrimination, filed with the EEOC, Plaintiff asserted that Defendant "fosters institutional animus and retaliation against disabled employees and older employees, who are approaching early retirement eligibility." (EEOC Charge 1.) Plaintiff contends that "[s]enior managers tolerate, ratify and are complicit in [] ADEA, Title VII and ADA discrimination and retaliation. (*Id.*) To the extent Plaintiff attempts to assert that Defendant systematically discriminates against persons of her gender, in her age group, or with like disabilities, Plaintiff presents no evidence as to how Defendant treats other individuals in those protected classes. *See Sosa v. Rockland Cnty. Cmty. Coll.*, No. 04-CV-8722, 2007 WL 1295723, at *4 (S.D.N.Y. May 1, 2007) (rejecting institutional discrimination claim when the plaintiffs failed to produce evidence of widespread animus or pretext, or that the defendant's policies functioned impartially or otherwise promoted institutional discrimination) *aff'd sum nom. Sosa v. Rockland Cmty. Coll.*, 302 F. App'x 56 (2d Cir. 2008). Aside from her vague allegations, which appear in depositions which she conducted, and in her statements to the Court presented at oral argument, that Defendant is phasing out Level II Supervisors, Plaintiff has not shown that this "phasing out" has anything to do with animus against certain classes of individuals. Even viewing the facts in the light most favorable to Plaintiff, her claims for "institutional discrimination" and "institutional retaliation" cannot stand, and the Court grants Defendant's motion for summary judgment as to these claims.

### III.  Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment in its entirety.  The Clerk of the Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 26, 2015
       Brooklyn, New York